Xenia Deviak v. Commissioner.
Deviak v. Commissioner
Docket No. 77972.
United States Tax Court
T.C. Memo 1960-118; 1960 Tax Ct. Memo LEXIS 168; 19 T.C.M. (CCH) 626; T.C.M. (RIA) 60118; June 8, 1960
Paul Ackerman, Esq., 2000 P Street, N.W., Washington, D.C., for the petitioner. Kenneth G. Anderson, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: This proceeding involves *169 a deficiency in income tax for the taxable year 1955 in the amount of $1,818.41. The issues for decision are: (1) Whether petitioner is entitled to a net operating loss carryover to the taxable year 1955 resulting from the confiscation in 1953, and the nationalization in 1954, by the Yugoslav Government, of her interest in two parcels of real property; and (2) whether petitioner is entitled to a deduction in excess of that allowed by respondent for expenses incurred in the operation in her apartment of a wholesale jewelry business. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. Xenia Deviak (hereafter referred to as the petitioner) resided in New York City during the taxable year 1955. She filed an individual Federal income tax return for that year with the district director of internal revenue, upper Manhattan district, New York City. Petitioner was born in Yugoslavia. Her father was Milan Srskic, a man who served his country as a member of its Parliament for 20 years, and, in 1934 became Prime Minister of Yugoslavia. Throughout his public career, Milan Srskic was a member of the pro-monarchist Conservative Party. Petitioner *170 married Millord Deviak in 1933. Millord was called into the service of the Royal Yugoslav Army upon the outbreak of hostilities in 1941. He was captured by the German Army and held as a prisoner of war in Germany until 1942. He was then sent to a prisoner of war camp in Italy. As for the petitioner, she left Yugoslavia in 1942 for Italy where she was confined as a refugee by the Italian authorities. Subsequently, both petitioner and her husband escaped to Switzerland. In 1948 they entered the United States of America, becoming naturalized citizens in 1954. In 1931 petitioner's father acquired, in the joint names of his three children, Xenia, Miriana, and Stijepo, a home in the residential section of Belgrade. Each child was given a one-third interest in the property, it being understood that their parents were to reside there for the rest of their lives. Petitioner's father paid 3,500,000 dinars for the house, 1,000,000 dinars for the real estate, and expended some 500,000 dinars by way of improvements to the property. The plot upon which the residence stood faced on two streets, and contained in excess of 1,000 square meters. The house itself had a basement, a ground level, and *171 two upper floors. On the ground level were a drawing room, four parlors, a dining room, a utility kitchen, a gardener's room, and two large terraces. The second floor was well appointed with six bedrooms, each with a terrace opening out, as well as a large bath. Four bedrooms and a bath comprised the third floor. Adjoining the residence was a two-car garage, which contained chauffeur's quarters above. Upon the purchase of the property, petitioner, her father and mother, sister and brother all moved into the premises. After petitioner's marriage to Millord in 1933, she moved from the jointly-held property. Thereupon, her father undertook to pay her the monthly sum of 10,000 dinars, a practice which he continued until his death in 1937. Thereafter, her brother Stijepo continued these payments. In 1939, upon petitioner's request, Stijepo advanced her 360,000 dinars against the monthly payments which would have been made over the next three years. Petitioner was the only one of the joint owners of the property to receive such payments. She made no expenditures, in the way of taxes, maintenance or repairs, upon the premises. In 1941 the property was requisitioned by the German Army *172 to house troops and petitioner's family was forced to evacuate. German use of the premises continued until the end of World War II. In 1944 the property was successively occupied by Russian and Yugoslav troops. Thereafter, various Yugoslav governmental organizations took possession of the premises. Throughout this period no rents were received by petitioner or her family for the use of the property. On March 27, 1947, the Ministry of National Health of the Federal Peoples Republic of Serbia summoned petitioner's mother to its offices and laid before her, for her signature, a "contract" relating to the jointly held property. As of that time, the Yugoslav Government had possession of the premises. The "contract", as translated, provided: "I have today leased the house in Lamartin Street, No. 47 (consisting of a basement, main floor, first floor, attic and garden) to the Ministry of National Health of Serbia, represented by Dr. Jelena Kosanovic, Chief of Section of the said Ministry. "The annual rent is 36,000 dinars, that is 3,000 dinars per month, for a period of ten years. "The lease starts with the day of occupancy during 1947, and [shall continue] until notice to quit is *173 given. "The tenant, the Ministry, is authorized to make the repairs necessary to render the building adequate for the accommodation of a home for small children and babies. "In order to repair the building, the Ministry may expend up to 280,000 dinars, which shall be charged against the rental for the ten year period. "The landlord undertakes to pay Federal and City taxes; however, such payments will be made by the Ministry from the funds resulting from the rent. "All expenses directly connected with the use of the building, such as consumption of water and electricity, shall be paid by the tenant. "The rent shall not be paid to the landlord until all expenses made for the repair of the building are covered, and when those expenses are paid, the rent shall be paid in advance to the landlord until the 5th of each month. "In the event of a sale of the estate under this lease, the buyer shall not have the right to terminate this contract until the same has expired. "The parties to this contract waive their rights to contest this contract on the ground of damages in excess of one-half. "This contract is made out in two identical copies, which shall be legalized at the Court, *174 of which the original shall be handed over to the tenant and the landlord shall retain a copy thereof. "The landlord shall pay all expenses of court certification." Petitioner's mother signed the "contract", being given no opportunity to bargain for any of the terms therein. No rental payments were ever made by the Yugoslav Government, nor any accountings rendered. In 1939 petitioner and her husband purchased a plot of ground in a residential section of Belgrade upon which they constructed a personal residence. They paid 380,000 dinars for the lot and expended 1,100,000 dinars for the construction of their home. A brick wall surrounded the house. The grounds were landscaped, and contained flagstone paths. The house itself contained a basement, first floor, second floor, and attic. On the first floor was a marble entrance hall, a living room, a library, studio, gallery, a dining room, pantry and kitchen. The second floor contained four bedrooms, three baths, an enclosed gallery, and two terraces. The attic contained two rooms. Petitioner held a one-half interest in this property. In the late summer of 1941 petitioner moved from this house, taking a small apartment in which *175 to live. Thereupon she rented the house to various diplomats at a monthly rental of 9,000 dinars. Until she left Yugoslavia in 1942 petitioner collected the rentals herself. Prior to her leaving Yugoslavia petitioner asked her mother to look after the property and to collect the rents. Her mother in turn asked petitioner's brother to see to the rentals. This he did, turning them over to petitioner's mother-in-law for her support according to instructions from the petitioner. This arrangement continued until some time in 1944. At that time, the property was vacated by the tenants and it was taken over by the Russian Army. Russian occupation of the premises continued for a few months, at the expiration of which time the Yugoslav Army moved in. Thereafter, the premises were occupied by several Yugoslavian governmental organizations. On January 27, 1953, a decree was entered by the Second County Court for the City of Belgrade with respect to this property, translated extracts of which are set forth below: "DECREE "The real property of convicted Milorad Divjak, former attorney of Belgrade, and his wife Xenia, * * * is hereby confiscated and taken for the benefit of the Government *176 of Federal People's Republic of Yugoslavia, * * *. * * *
"The People's Committee for the City of Belgrade, by request No. 17563 of August 1, 1947, moved that the property described above, property of Milorad Divjak and his wife Xenia, be placed under sequestration - compulsory management - as property of persons who left since the liberation and went abroad and have not reported, and therefore the proceedings for the deprivation of citizenship have been initiated according to the Law Regarding the Loss of Citizenship of Commissioned and Non-commissioned officers of the Former Yugoslav Army who do not return home, or participants in military units who served the occupier and fled abroad, as well as persons who fled after the liberation. This court, by its decree No. 156/47 of September 17, 1947, upon the inventory, placed the abovedescribed property under sequestration - forced management -, and delivered this property to the People's Committee of the VII Precinct of the City of Belgrade. "The Division of Internal Affairs of the People's Committee of the VII Precinct of the City of Belgrade, by its request No. 2092/52 of May 13, 1952, submitted to this court the decree of the *177 Ministry of Interior of the FPRY, No. 2009/49 of September 27, 1949, by which the citizenship of escapees Milorad and Xenia Divjak has been revoked, and moved to confiscate the property of the escapees. "On the basis of the above motion, and in accordance with section 97 in conjunction with section 84 of the Law Concerning Enforcement of Punishment, Preventive Measures and Correctional Measures, this court issued the decree concerning the taking of the property of confiscatees Milorad Divjak and his wife, Xenia, as described above, * * *" On April 28, 1948, the Federal Council and the People's Council of the People's Assembly of the Federative People's Republic of Yugoslavia enacted a Law on Amendments and Additions to the Law Regarding Nationalization of Private Economic Enterprises, which was duly proclaimed by the Presidium of the People's Assembly of the Federative People's Republic of Yugoslavia, a translated extract of which is set forth below: "On the day this Law becomes effective, all real property owned by foreign citizens, foreign institutions and foreign private or public persons, is nationalized and passes into State ownership. "Excepted are: (1) Real property *178 of peasant farmers who, themselves, are cultivating the land; (2) Dwelling houses, used by their owners principally as their living quarters; (3) Real property of foreign States which serves for official purposes. "A Yugoslav citizen who becomes a foreign citizen loses in the FPRY the right of ownership of real property, which passes into the ownership of the State. Only the Minister of Justice may make exceptions. "The Minister of Justice shall issue the necessary Instruction for the transfer to the State of nationalized real property." Petitioner's brother, Stijepo, served as a member of the Anti-German and Anti-Communist guerilla forces of Draja Mihailovic. Sometime in 1944 he was taken by Communist forces and presumably met his death at their hands. Subsequently, in March of 1945, pursuant to the law of the land, his property was confiscated by the State. Since her arrival in the United States, petitioner's principal occupation has been that of a fashion designer. In addition, during the year in issue, she engaged in the wholesale jewelry business which she carried on in her New York apartment. Petitioner's income from her designing activities during 1955 was $9,387.58. *179 Her gross receipts from her jewelry business were $2,042. The monthly rental on petitioner's New York apartment during 1955 was $219. The apartment itself was composed of four and one-half rooms: a combination living and dining room, a kitchen, two bedrooms, and one other room. Petitioner's jewelry and pearl-stringing activities were carried on in the living-dining room and the other room. The work was actually carried out in the living-dining room, and at the close of each day the materials were taken into the other room. The work itself required substantial space, due to the fact that the materials such as beads and pearls could not be mixed together. Certain machines and tools were utilized in the work. During 1955 five people lived in this apartment: petitioner, her husband, her mother, her daughter, and her nephew. Petitioner allocated one-third of the annual rental on this apartment to her business activities, claiming a deduction therefor on her 1955 return in the amount of $876. Petitioner used her automobile in her jewelry business to pick up materials and make delivery of her products. The car cost $3,675.43. On her 1955 return she claimed a depreciation deduction of *180 $244.33 for this automobile, arrived at by using an estimated life of five years for the asset which was depreciated on the straight-line method, and allocating one-third of its use to her business. She further claimed a deduction in the amount of $240 for "1/3 cost of garaging and maintaining car per statement attached." Petitioner used her telephone in the jewelry business during the year in issue. On her return she claimed a deduction in the amount of $20.40 for "1/3 of telephone bill." Of these deductions, totalling $1,380.73, respondent disallowed $900, on the ground that they were unsubstantiated. On her 1955 return, petitioner claimed a net operating loss carryover from 1954 in the amount of $19,646.46, on the basis that her interests in the Belgrade properties were, in 1953 and 1954, confiscated or nationalized, at which time they constituted rental properties, thereby giving rise to a deductible trade or business expense. Respondent disallowed the claimed net operating loss carryover deduction in full. The parties have agreed that "the rate of exchange as shown in the pertinent Internal Revenue Bulletins shall be considered as the current or market prices of exchange *181 between the Yugoslav Dinar and the United States Dollar." Opinion Initially our attention is directed to petitioner's claim that she is entitled to a net operating loss carryover in the amount of $19,646.46 for the taxable year 1955 which she contends arose from net operating losses sustained in 1953 and 1954 as a result of the confiscation and nationalization of her interest in two properties situated in the City of Belgrade, Yugoslavia. One of these properties was owned jointly with her husband. She concedes this was originally residential property, but argues it was converted to rental property in 1941 when she rented the premises to members of the diplomatic corps, an arrangement which was interrupted by the appearance of Russian troops in Belgrade in 1944. She maintains her interest in this property was lost in January of 1953, when it was confiscated by decree of the Second County Court of the City of Belgrade. Arguing that the loss attributable to this confiscation constituted a loss incurred in the operation of a trade or business within the meaning of section 23(e) of the 1939 Code, she contends that it gave rise to a net operating loss in 1953 as provided for in section *182 23(s) of the 1939 Code. As to the property owned equally with her brother and sister, petitioner claims this was converted to rental property by virtue of the monthly payments received from her father beginning in 1933, and continued by her brother until 1942. She concedes this property produced no income during the 1942-1947 period, submitting this was due to its successive occupation by German, Russian, and Yugoslav troops, as well as Yugoslav civilian personnel. However, she points to the "contract" which her mother signed with the Ministry of Health, providing for a 10-year "lease" of the premises, contending this constituted a rental of the property. Taking the position that her interest in this property was nationalized when she acquired citizenship in the United States in 1954, she contends she sustained in that year a loss incurred in a trade or business within the meaning of section 165 of the 1954 Code, which gave rise to a net operating loss for that year as provided for by section 172 of that statute. In computing the loss for which she now contends, petitioner uses the adjusted basis for each property, determined as of the year in which her interest therein was taken. *183 She arrives at her adjusted basis by reducing the original cost of the property by depreciation computed at an annual rate of 2 per cent, and dividing the resulting figure by her fractional interest in the specific property. Respondent attacks petitioner's position on 4 grounds. He argues (1) that she has not established her adjusted basis in these properties as of the years in which they were allegedly lost; (2) that neither loss was sustained in a trade or business; (3) assuming conversion of the properties to trade or business use, no proximate relation has been shown between the losses and a trade or business regularly carried on; and (4) assuming petitioner held bare legal title in these properties in 1953 and 1954, for all practical purposes the loss of her interest therein occurred many years prior thereto. Before a net operating loss may be made the subject of a net operating loss carryback and carryover, it must be affirmatively established that the loss itself was attributable or proximately related to a trade or business regularly carried on by the taxpayer claiming the specific deduction. (C.A. 8, 1948); . *184 Thus it was petitioner's burden to prove, among other things, that the two properties here in issue were used by her in a trade or business, and that the loss occasioned by their confiscation and nationalization was related to that trade or business. We are of the opinion that she has failed to meet that burden. The rental of a single piece of residential property may properly constitute use of the property in a trade or business, , and that trade or business may be carried on by an agent in a foreign country, . So much respondent concedes. However, he argues that "where the business activity is minimal or non-existent, the Court would find no 'use of the property in a trade or business'." So far as the property owned jointly by petitioner and her husband is concerned, the record indicates that it was rented in 1941 to members of the diplomatic corps, petitioner collecting the rents personally until she fled the country in early 1942. Thereafter, the property was seen to by members of her family, the rents being turned over by them to her mother-in-law. This activity came to a halt *185 in 1944 when the Russians entered the City of Belgrade. Thereafter, the property was occupied by the Russian and Yugoslav Armies, and Yugoslav civilian organizations. No rents were ever paid by these "tenants," nor was any accounting made for the property. In September of 1947 the property was placed under "forced management," and delivered to one of the many Committees used by the governing body to benefit the people of Yugoslavia. In 1953 whatever interest the petitioner still had in the property was confiscated by decree. We are unable to relate whatever loss may then have occurred with a trade or business regularly carried on by petitioner at that time. The last renting of the property had taken place at least 9 years before, and other than this, the record is silent as to its use in a trade or business. Much the same applies to the property acquired by petitioner in 1931 from her father. Originally, this property was made the subject of a gift by the father to his 3 children, it being understood that their parents were to reside therein for the rest of their lives. We cannot agree with petitioner that the monthly payments to petitioner, commenced by her father in 1933 and continued *186 by her brother until 1942 constituted "rent" for the use of the premises which had the effect of converting her interest therein to rental property. Whatever may have been the purpose of these payments, they surely did not constitute "rent" in the commercial sense. Neither did they serve to put petitioner in the trade or business of renting her fractional interest in the property. Petitioner did nothing more with respect to this property than receive the monthly payments. She contributed in no way to its upkeep, nor did she see to the satisfaction of any of the taxes levied thereon. By way of additional support for her position with respect to this property, petitioner points to the "contract" executed with the Yugoslav Ministry of Health by her mother. As we understand her argument, she contends the designation in that document of the Ministry as "tenant," the owner as "landlord," and the monthly payments as "rent" establishes a lease of the property to the Ministry. Though no rents were ever received, she maintains that she received "benefit from the administration of the property by the government in that it was repaired, maintained and the taxes paid thereon out of the rental *187 received and the government borrowed funds to renovate the property so that it could be utilized in a more efficient manner than as a single residence." While these benefits may have inured to petitioner, a fact which appears doubtful, we cannot accept her argument that the execution of the purported contract served to place her in a trade or business such as contemplated by the statute. At the time the "contract" was offered for signature, the Ministry was in full possession of the property, thus strongly suggesting that the munificence of the "tenant" was engendered solely by a desire to lend a color of legality to its possession. Moreover, there were no negotiations as to the terms of the "contract." Petitioner's mother had no choice. Whether she signed or not the result would be the same; the Ministry was in possession of the property. Finally, by its very terms the "contract" seems to us to be nothing more than an appropriation of the property for use by the government. The fact that no rentals or accountings have ever been received from the "tenant" strengthens this conclusion. Thus, so far as this record is concerned, this property was never used by petitioner in a trade or *188 business. Under these circumstances, we are unable to conclude that whatever loss may have arisen when the property was nationalized in 1954 was attributable or proximately related to a trade or business regularly carried on by her. In light of the above conclusions, respondent properly disallowed the net operating loss carryover claimed by the petitioner on her 1955 return. The final issue concerns expenses allegedly incurred by petitioner in the operation of her jewelry business in her New York apartment, which were disallowed by respondent as unsubstantiated. On her return, under the heading of "Other Business Deductions," petitioner claimed as a deduction the amount of $1,380.73, for the items set forth below: 1/3 of rent on apartment
$ 876.00
1/3 depreciation on car
244.33
1/3 of telephone bill
20.40
1/3 cost of garaging and maintain-
ing car
240.00
$1,380.73 Respondent disallowed $900 of the total deduction so claimed "for the reason that no competent evidence or appropriate information was submitted in substantiation thereof." At trial, petitioner testified that she used her apartment, automobile and telephone in her business, estimating one-third *189 of the total use of these assets was attributable to that business. She further testified that the monthly rental on her apartment was $219; that the cost of her automobile was $3,675.43; and that her total telephone bill for 1955 was $200 (a figure at variance with the amount claimed in her return). No other evidence was introduced. In this state of the record, we cannot agree that petitioner has overcome the presumptive correctness of respondent's determination. In effect, petitioner's testimony is merely a catalogue or reassertion of those items which appear on her return. No substantiating or corroborative evidence was presented. In effect, petitioner has done nothing more than swear to the correctness of her return. As we have often said, this is not sufficient to meet the burden of proof which rests upon the taxpayer. See . It should be noted that this is not a case for the application of (C.A. 2, 1930), inasmuch as respondent did not disallow in full the expenses claimed. Decision will be entered for the respondent.